**FREEDMAN & TAITELMAN, LLP**
Michael A. Taitelman, Esq. (SBN 156254)
Jesse A. Kaplan, Esq. (SBN 255059)
1901 Avenue of the Stars, Suite 500
Los Angeles, CA 90067
Telephone: (310) 201-0005
Facsimile (310) 201-0045

**MARKS & KLEIN, LLP**
Justin M. Klein, Esq.
David S. Paris, Esq.
63 Riverside Drive
Red Bank, New Jersey 07701
Pending *pro hac vice* admission

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT DILLON, Individually and on behalf of all others similarly situated, | CASE NO.: **2:08-cv-4515-SVW (AJWx)** |
| Plaintiffs, | **FIRST AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND** |
| vs. | |
| LIFELOCK, INC., a Delaware Corporation; RICHARD TODD DAVIS, a citizen of the State of Arizona, and JOHN DOES 1 through 10, Inclusive, | |
| Defendants. | |

- 1 -

Plaintiff, Robert Dillon, individually, and on behalf of all others similarly situated, by and through his counsel, Marks & Klein, LLP, and Freedman & Taitelman, LLP, hereby submits this First Amended Complaint against Defendants, LifeLock, Inc., Richard Todd Davis, and John Does 1 through 10 (collectively, "Defendants"). In support thereof, Plaintiff alleges as follows:

## INTRODUCTION

1.     This is a class action lawsuit brought by, and on behalf of, California subscribers of LifeLock, Inc. ("LifeLock"), a company that holds itself out as "the industry leader in the rapidly growing field of Identity Theft Protection."

2.     This matter arises from the deceptive business practices and fraudulent advertising campaign implemented by LifeLock, its agents, employees, and representatives, through which it has induced nearly one million individuals, including the Plaintiff and the putative class in the state of California, into subscribing to the identity theft protection services the company purportedly provides.

3.     To induce consumers across the country to subscribe to its services, LifeLock claims in its advertisements that it will prevent any possibility of identity theft, in any form.

4.     In LifeLock's ubiquitous marketing campaign, the company's Chief Operating Officer ("CEO"), Richard Todd Davis ("Davis"), cavalierly broadcasts his own social security number – 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 – on television and radio stations across the country, proclaiming his unwavering confidence in LifeLock's purported protections.

5.     In reality, however, LifeLock simply does not provide the level of identity protection that it advertises in its deceptive marketing campaign.

6.     Contrary to the all-encompassing identity protection LifeLock promotes in every one of its advertisements, its protection only extends to limited, credit-related instances of "new-account" identity theft.

7.     Even in those limited credit-related instances, LifeLock does not necessarily protect its subscribers' identities as advertised.

8.     Indeed, the representations made by LifeLock's CEO are false and misleading because his own identity was stolen while he was a LifeLock customer.

-2-

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

9.     While LifeLock has only publicly acknowledged that Davis's identity was compromised on one (1) occasion, there are more than twenty (20) driver's licenses that have been fraudulently obtained through the misappropriation of Davis's personal information.

10.     Furthermore, a simple background check performed using Davis's social security number reveals that his entire personal profile has been compromised to the extent that the birth date associated with his social security number is November 2, 1940, which inaccurately makes Davis 67 years old.   This inaccurate information can most certainly be attributed to a misappropriation of Davis's social security number.

11.     In addition to its inability to provide the level of protection it advertises, each of LifeLock's advertisements fails to disclose and intentionally omits from its advertisements the potential harms that its services may have on consumers.

12.     As described in further detail below, LifeLock's services can actually have an adverse impact on the consumer's ability to obtain credit or favorable interest rates.

13.     Furthermore, in its advertisements, LifeLock fails to adequately advise or make clear to consumers that they could perform each of LifeLock's services on their own, free of charge.

14.     Instead, in the few recent advertisements in which LifeLock does allude to this fact, LifeLock preys on consumer fears and misleads potential subscribers into believing that the services it provides embody a complicated, time-cons uming process that require LifeLock's "expertise" and assistance.

15.     LifeLock also fails to adequately disclose and intentionally omits from its advertisements the fact that the credit reports it orders on behalf of the subscribers is the free annual credit report, which subscribers are entitled to receive when placing their own fraud alerts, pursuant to 15 U.S.C. §1681c-(a)(2)(B).

16.     As a result, when LifeLock orders the free annual report, it renders the subscribers ineligible to order their free report for the next twelve months. This fact is not disclosed to subscribers.

17.     Every one of LifeLock's advertisements also fails to adequately disclose and

- 3 -

1    intentionally omits the true nature and limited scope of its $1,000,000 service guarantee.

2        18.    In fact, the deceptive and misleading message that is broadcast through each of

3    LifeLock's advertisements – which purports to guarantee LifeLock's services up to $1,000,000 –

4    is starkly contradicted by LifeLock's own deceptive and misleading terms, which severely limit

5    the scope and application of the "guarantee" due to the numerous restrictions, limitations, and

6    waivers that are present within its terms.

7        19.    Finally, LifeLock fails to disclose that the methods it employs in providing its

8    purported protection are improper and violate the Fair Credit Reporting Act, 15 U.S.C. §1681, et

9    seq.

10                      **JURISDICTION, VENUE, AND PARTIES**

11

12       20.    This Court has original jurisdiction over this matter, under 28 U.S.C.§ 1332(d)(2),

13   as the matter in controversy exceeds Five Million Dollars ($5,000,000.) exclusive of costs and

14   interest, and is a class action where at least one member of the class of plaintiffs is a citizen of a

15   State different from any defendant.

16       21.    This Court has personal jurisdiction over defendants in that defendants conduct

17   business in this District, defendants intentionally direct activities to this District, and the conduct

18   upon which the allegations in this Complaint are based occurred in this District.

19       22.    Venue is proper in this Court pursuant to 28 U.S.C. §1391(b) in that this is the

20   District in which a substantial part of the events or omissions giving rise to the claims hereinafter

21   set forth occurred.

22       23.    Plaintiff Robert Dillon ("Dillon") is a citizen of the State of California, and a

23   resident of Contra Costa County.

24       24.    Plaintiff Dillon enrolled as a LifeLock subscriber in 2008.

25       25.    Plaintiff Dillon is a proper party plaintiff to this action because he has suffered

26   losses as a result of LifeLock's unlawful conduct alleged herein.

27       26.    Defendant LifeLock is a Delaware corporation with its principal place of

28   business at 60 E. Rio Salado Parkway, Tempe, Arizona 85281.

- 4 -

27.     Defendant LifeLock maintains its principal place of business in Arizona and transacts substantial business within California and, specifically within this Los Angeles County, and is amenable to personal jurisdiction in California.

28.     Defendant Davis is a resident of Chandler, Arizona. Defendant Davis is the Chief Executive Officer of LifeLock.  Davis transacts business within the State of California and has specifically availed himself to the courts of this State.

29.     The true names and capacities, whether individual, corporate, associate or otherwise, of Defendants named as JOHN DOES 1 through 10, inclusive, are unknown to Plaintiff and the putative class who, therefore, sue those Defendants by such fictitious names.

30.     Plaintiff and the putative Class are informed and believe and thereon allege that each Defendants sued herein as JOHN DOES 1 through 10 are and were the agents and/or employees of each and every other Defendant and were at all relevant times acting within the course and scope of such agency and employment, and/or are legally responsible in some manner for the events and happenings herein referred to, and caused injuries and damages proximately thereby to Plaintiff and the putative Class as alleged herein.

31.     Plaintiff will seek to amend this Complaint to allege the true names and capacities of such Defendants when ascertained.

## THE HISTORY OF LIFELOCK

32.     In or about 2005, Defendant Davis and his colleague Robert J. Maynard, Jr. ("Maynard") founded LifeLock.

33.     According to the company's website, LifeLock is the "industry leader" in "proactive identity theft protection, specializing in prevention of identity theft rather than the reporting of it."[1]

34.     LifeLock further claims that its identity theft protection system was developed as a result of "more than three years" of "solid research" and building "relationships with the right organizations."[2]

---

[1]  (http://www.lifelock.com/lifelock-for-people/who-we-are/who-is-lifelock, as of July 7, 2008).
[2]  (http://www.lifelock.com/lifelock-for-people/who-we-are/who-is-lifelock, as of July 7, 2008).

35.     Since its inception, LifeLock's purported "goal" has been "to lock down every individual's private information so no person except that individual can approve its use."[3]

### LIFELOCK'S NEFARIOUS ORIGIN

36.     Throughout its countless hours of advertising, LifeLock never discloses any of the less propitious information about its origin or its founding member, Robert Maynard ("Maynard").

37.     At the time Maynard founded LifeLock, he was, and presently remains, subject to an injunction obtained by the FTC banning him for life from "advertising, promoting, offering for sale, selling, performing, or distributing any product or service relating to credit improvement services."

38.     The injunction issued against Maynard resulted from his production of misleading infomercials regarding the services provided by his credit improvement company, National Credit Foundation.

39.     Upon information and belief, these harsh sanctions were also meant to penalize Maynard for engaging in a scheme through which he arranged unauthorized withdrawals from customer accounts at National Credit Foundation.

40.     Upon further information and belief, Maynard himself has engaged in the very type of identity theft that his company purportedly sets out to eliminate, by stealing his own father's identity.

41.     Specifically, upon information and belief, Maynard misappropriated his father's identity to obtain an American Express card.

42.     Maynard then ran up over One Hundred Thousand Dollars ($100,000.00) in debt on the charge card.

43.     Eventually, American Express sued Maynard's father in an effort to recover the balance.

44.     Finally, and perhaps most disturbing, is that Maynard's "story" about how LifeLock was founded was a **bold faced lie,** which was widely disseminated to the public by Maynard himself, as well as CEO Davis and other LifeLock executives.

---

[3] Id.

- 6 -

45.     Specifically, Maynard, along with Davis[4], and LifeLock Vice-President of Communications Mike Prusinski, spun a fictitious tale in the press, maintaining that Maynard founded LifeLock after he was falsely arrested as a victim of identity theft.

46.     In actuality, Maynard's "false arrest" turned out to be an actual arrest, which involved **absolutely no incidence of identity theft**.

47.     Rather, upon information and belief, Maynard was arrested and imprisoned for seven (7) days for failing to pay a $16,000 casino marker at the Mirage Hotel and Casino.

## THE SERVICES LIFELOCK PROVIDES

48.     According to the company's official website, a general LifeLock subscription provides four (4) services that are designed to protect its subscribers from identity theft.

49.     First, LifeLock "ask[s] the credit bureaus to set free fraud alerts on [the subscriber's] behalf."

50.     Second, LifeLock renews those fraud alerts "every 90 days or so."

51.     Third, LifeLock requests that subscribers' names be removed from pre-approved credit card and junk mail lists.

52.     Fourth, every year, LifeLock orders free credit reports, on behalf of its subscribers, from the major credit bureaus.

## LIFELOCK MISREPRESENTS THE SCOPE OF ITS SERVICES

53.     LifeLock deceptively markets its services through: (a) its website located at www.lifelock.com; (b) affiliated web pages; (c) press releases; (d) news publications; (e) television commercials; and (f) radio advertisements.

---

[4] Various examples of Defendant Todd Davis recanting the false story regarding LifeLock's founding are readily accessible on the internet. For example, Davis was quoted saying: "My co-founder, Robert Maynard, who is our Chief Marketing Officer, he actually had his identity stolen in 2001. He had to spend seven days in jail, because someone had stolen his identity and opened up lines of credit at a Las Vegas casino. So Robert thought there was something we could do to protect consumers. So about 2 1/2 years ago, we got together, and we also brought in the former vice chairman of Bank of America--who is now the chairman of our board--and the former Chief Information Officer of Visa, and developed this technology. We incorporated in April of 2005, and we are now the fastest growing identity theft protection company and add a new subscriber every two minutes." (http://www.techrockies.com/story/0007560.html, as of July 7, 2008).

- 7 -

54.     LifeLock knows, yet fails to disclose, that the services it provides do not offer the breadth of protection that it promotes through its massive advertising campaign.

55.     The primary service that LifeLock provides to protect against identity theft is the placement and renewal of fraud alerts on subscribers' credit profiles.

56.     The representations made in LifeLock's advertisements regarding the scope and effectiveness of fraud alerts are misleading and fail to disclose material facts regarding the limitations inherent in the service.

57.     Through every one of its advertisements, LifeLock misrepresents and assures consumers that it can protect against all types of fraud. These representations are false.

58.     In actuality, the fraud alerts LifeLock places only work to combat credit-related, new account identity theft, which is merely one form of theft amongst many others, including: (a) bank account related identity theft; (b) employment related identity theft; (c) medical information related identity theft; (d) government documents or benefits identity theft, and (e) computer and telecommunication related theft

59.     There is no conspicuous mention of this fact, nor any disclaimer in the wealth of information regarding LifeLock's services on the company website or in LifeLock's advertisements.

60.     In contrast, LifeLock's advertisements deceptively create the illusion that LifeLock provides complete and comprehensive identity protection against all forms of theft, by employing misrepresentations that include, but are not limited to, the following:

(a)     "Here's a report I have on John Sheiper, a young hacker – sent out a virus, put more than 250,000 computers to work stealing passwords to bank accounts from people around the world;"[5]

(b)     "LifeLock's own CEO is so positive our service secures identities that he has broadcast his social security number on our homepage, in our commercials, and in our media spots because he wants to prove that we

---

[5]     LifeLock radio advertisement.

- 8 -

can protect anyone's identity from scammers, thieves, and hackers;"[6]

(c)  "This very second, someone could be using your identity to...clear out your bank accounts...Stop it from happening now. Call LifeLock...;"[7] and

(d)  "LifeLock, the industry leader in proactive identity theft protection, offers a proven solution that prevents your identity from being stolen before it happens."[8]

(e)  "One victim even had his identity stolen by a man who went on to commit rape and murders using the victim's name... LifeLock's proactive approach to identity theft protection and $1 Million Total Service Guarantee helps reduce the risk of members becoming victims of [these] **exact scenarios**, as well as the money and time used to restore their good name."[9]

## LIFELOCK MISREPRESENTS THE EFFECTIVENESS OF ITS SERVICES

61.    Through its deceptive advertisements and marketing tools, LifeLock misrepresents the effectiveness of the services it provides.

62.    LifeLock knows, yet fails to disclose in each of its advertisements, that the services it provides do not offer the comprehensive level of protection that is advertised to consumers through its massive advertising campaign.

---

[6]  *See*  http://lifelockprotection.wordpress.com/2007/11/10/lifelock-protect-your-good-name, as of July 7, 2008.
[7]  LifeLock radio advertisement.
[8]  *See*  http://www.lifelock.com/default.aspx?promocode=Shareasale&SSAID=252168, as of July 7, 2008.
[9]  http://www.lifelock.com/todd-davis?promocode=ADCONION, as of July 7, 2008. (emphasis added).

- 9 -

1    63.    Specifically, LifeLock misrepresents that its subscribers will receive a telephone
2    call each time his or her personal information is used to apply for new credit.

3    64.    LifeLock fails to advise subscribers that companies and institutions that issue
4    credit **are not required by law** to contact them, even if they have fraud alerts in place.

5    65.    LifeLock's misrepresentations regarding the effectiveness of its services include,
6    but are not limited to, the following:

7    (a)    "Once fraud alerts have been placed, you will receive a phone call — most
8           people register their cell phone numbers — anytime someone tries to open
9           a credit line in your name;"[10]

11   (b)    "If it's you trying to open the account, then you'll get the call *while you're*
12          *standing there*;"[11]

14   (c)    "The alert *ensures* you will receive a phone call *whenever* someone –even
15          you-tries to establish using your identifying information...;"[12]

17   (d)    "When someone seeks to open a new account, the creditor *will call* to
18          confirm that it's really you through a series of identifying questions;"[13]

20   (e)    "If someone is trying to use your personal information, you will be
21          contacted by the creditor that is issuing the line of credit;[14]

---

[10] Statement by Defendant Davis, CEO of LifeLock, Inc., in article entitled "Fraud alerts can protect ID," www.azstarnet.com/business/202488, as of July 7, 2008.
[11] Statement by Defendant Davis, CEO of LifeLock, Inc., in article entitled "Fraud alerts can protect ID," www.azstarnet.com/business/202488, as of July 7, 2008. (Emphasis added.)
[12] *See* www.mylifelock.org, as of July 7, 2008. (Emphasis added.)
[13] Statement by Defendant Davis, CEO of LifeLock, Inc., in article entitled "Protecting identity among the tell-all generation," www.startribune.com/templates/Print This Story?sid=1191451, as of July 7, 2008. (Emphasis added.)
[14] *See* http://www.lifelock.com/lifelock-for-people/what-to-expect/who-calls-me-to-let-me-know-that-someone-is-attempting-to-obtain-credit-in-my-name, as of July 7, 2008.

- 10 -

(f)     "You will know whenever anyone tries to use your credit before damage is done;"[15]

(g)     "The most important difference between LifeLock and other fraud protection services is our proactive approach to identity theft. LifeLock is not a credit monitoring service that alerts you when we find a problem, we actually stop crime *before it happens by having the credit bureaus alert you* when someone tries to make changes in your status or inquire about your credit;"[16] and

(h)     "We start by putting fraud alerts on your information with all three of the major credit card bureaus and ChexSystems, allowing only you to be able to apply for credit lines or make changes to your accounts. This is the most important step in our service because it prevents thieves from being able to use your identity, since the fraud alert *requires creditors to contact you* by the phone number listed on LifeLock's report before verifying any changes, such as extending limits or changing billing addresses."[17]

## LIFELOCK CONCEALS AND OMITS THE POTENTIAL HARMS THAT ITS SERVICES COULD HAVE ON SUBSCRIBERS' CREDIT PROFILES

66.     Through its deceptive advertisements and marketing tools, LifeLock conceals and omits the adverse effects that its services could have on its subscribers' credit profiles.

67.     LifeLock knows yet fails to disclose that the services it provides can have an adverse impact on a subscriber's credit profile.

---

[15] *See* http://www.idtheftquiz.org, as of July 7, 2008.

[16] *See* http://lifelockprotection.wordpress.com/2007/11/10/lifelock-protect-your-good-name, as of July 7, 2008.

[17]*See* http://lifelockprotection.wordpress.com/2007/11/01/comparing-lifelock/, as of July, 7 2008. (Emphasis added.)

- 11 -

1   68.   For instance, LifeLock's advertisements omit and conceal the fact that its

2   placement and continuous renewal of fraud alerts could actually prohibit its subscribers from

3   obtaining credit.

4   69.   Additionally, LifeLock's advertisements omit and conceal the fact that its

5   placement and continuous renewal of fraud alerts could have an adverse impact on its

6   subscribers' ability to obtain a home loan or refinance their existing loans.

7   70.   LifeLock's advertisements also omit and conceal the fact that each time a fraud

8   alert intercepts an attempt to obtain credit, an inquiry is created on the subscriber's credit profile,

9   which can adversely affect the subscriber's credit score.

10
## LIFELOCK OMITS OR CONCEALS THE TRUE ORIGIN
11
## OF THE CREDIT REPORT IT ORDERS FOR ITS SUBSCRIBERS
12

13  71.   LifeLock represents to consumers that its services include a credit report from

14  each of the three credit bureaus every twelve (12) months.

15  72.   However, through its deceptive advertisements and marketing tools, LifeLock

16  omits and conceals that the credit reports it orders on behalf of its subscribers are the free annual

17  credit reports which subscribers are already entitled to receive without being LifeLock

18  subscribers.

19  73.   LifeLock also omits and conceals that by its ordering of the credit report, the

20  subscribers are now rendered ineligible to order the free report on their own for the next 12

21  months.

22  74.   LifeLock further omits and conceals that ordering the free credit report from

23  www.annualcreditreport.com is duplicative of the free credit report consumers are entitled to

24  when placing a fraud alert under the Fair Credit Reporting Act, 15 U.S.C. § 1681c-1(a)(2)(B).

25

26

27

28

- 12 -

## LIFELOCK'S TERMS AND CONDITIONS ARE
## SUBSTANTIVELY AND PROCEDURALLY UNCONSCIONABLE

75. The services LifeLock provides to its subscribers are purportedly governed by LifeLock's "Terms and Conditions."

76. LifeLock's "Terms and Conditions" are presented to consumers on a take-it-or-leave-it basis, in a standardized printed form, and therefore is a contract of adhesion.

77. LifeLock's "Terms and Conditions" are inadequate, unreasonable, fraudulent, and beyond the understanding of consumers.

78. None of LifeLock's subscribers, including Plaintiff and the putative class, had any bargaining power with which to negotiate the "Terms and Conditions."

79. Additionally, the LifeLock "Terms and Conditions" include an arbitration clause that purports to prohibit class actions.

80. This provision is meant to deter and eliminate any possibility for a consumer to seek redress for any grievances for the deceptive conduct perpetrated by LifeLock.

81. While LifeLock purports to pay all of the costs of a subscriber's arbitration, this representation is false and misleading, as it fails to take into account the significant ancillary costs incurred as a result of the subscriber being required to arbitrate his or her individual claims in the State of Arizona.

82. Such costs include, but are not limited to, travel to and lodging in Arizona for both the subscriber and his or her attorney.

83. Moreover, the LifeLock "Terms and Conditions" attempt to require subscribers to pay their attorney's fees and costs, regardless of whether they prevail in any arbitration.

84. Such attorney's fees and costs exponentially exceed the cost of LifeLock's subscription fee, which renders the individual pursuit of one's claims against LifeLock not feasible.

85. Accordingly, the arbitration provision does not allow LifeLock subscribers, including Plaintiff and the putative class, to adequately vindicate their rights.

- 13 -

86.     Such a provision is so one-sided that it shocks the conscience, and is therefore unconscionable and unenforceable.

### LIFELOCK MISREPRENTS THE SCOPE
### AND NATURE OF ITS $1,000,000 SERVICE GUARANTEE

87.     LifeLock further deceives consumers by touting its "one-million dollar service guarantee" in each of its advertisements.

88.     Prior to August 22, 2007, LifeLock's Terms and Conditions defined the $1,000,000 guarantee at paragraph (I)(B)(9)(a) – (b), as follows:

a.      Our Guarantee is simple.  If you are our client when someone steals your personal information and subsequently misuses it, we will reimburse you any and all **direct expenses** that you incur and pay professionals with the proper expertise. The maximum amount that we will pay is $1 million over the life of the incident. We provide the guarantee because we are so confident in our product. (emphasis added).

b.      Direct expenses include **lost wages, long-distance calls, postage and other miscellaneous costs in addition to any funds that are actually stolen from you or a third party that holds you responsible**.  If you need an attorney to help resolve the claims, we will select them and manage the case on your behalf. (emphasis added).

89.     On or about August 22, 2007, in response to an action commenced by the Oklahoma State Insurance Commissioner, LifeLock revised its Terms and Conditions to define its $1,000,000 guarantee, at section "2," paragraph "G," as follows:

OUR GUARANTEE IS SIMPLE, BUT IT IS LIMITED. WE WON'T PAY MORE THAN $1,000,000 TO CURE THE FAILURE OR DEFECT IN OUR SERVICE, PER CLIENT, PER LIFETIME, REGARDLESS OF CIRCUMSTANCE. WE WILL NOT REIMBURSE SPECIAL, INCIDENTAL, INDIRECT OR

- 14 -

CONSEQUENTIAL DAMAGES, SUCH AS LOST WAGES OR PROFITS, LOSS OF BUSINESS, OR LOST OPPORTUNITIES. OTHER THAN OUR GUARANTEE, WE MAKE NO REPRESENTATION OR WARRANTY ABOUT OUR SERVICE OF ANY KIND, AND WE DISCLAIM ANY IMPLIED WARRANTIES OUTSIDE OF OUR GUARANTEE, SUCH AS A WARRANTY OF MERCHANTABILITY OR FITNESS OF OUR SERVICE FOR ANY PARTICULAR PURPOSE.

90.     After further revision in or about December 2007, LifeLock's Terms & Conditions, presently define the $1,000,000 guarantee at section "2," paragraph "G," as follows:

WE WILL PAY UP TO $1,000,000 TO CURE THE FAILURE OR DEFECT IN OUR SERVICE, PER CLIENT, PER LIFETIME FOR ALL INCIDENTS IN THE AGGREGATE, REGARDLESS OF CIRCUMSTANCE...WE WILL NOT MAKE PAYMENTS TO YOU FOR ANY LOSS YOU MAY INCUR. OTHER THAN OUR SERVICE GUARANTEE, AND EXCEPT AS OTHERWISE SET OUT HEREIN WE MAKE NO REPRESENTATION OR WARRANTY ABOUT OUR SERVICE OF ANY KIND, AND WE DISCLAIM ANY IMPLIED WARRANTIES OUTSIDE OF OUR SERVICE GUARANTEE, SUCH AS A WARRANTY OF MERCHANTABILITY OR FITNESS OF OUR SERVICE FOR ANY PARTICULAR PURPOSE.

91.     Despite the fact that LifeLock's Terms and Conditions have been materially altered to severely limit the scope and application of the $1,000,000 "guarantee," the message within each of LifeLock's advertisements, as it pertains to the "guarantee," has remained **entirely unchanged** - this is deceptive and misleading.

92.     Specifically, despite Terms and Conditions to the contrary, all of LifeLock's advertisements continue to deceive subscribers into believing that they will be reimbursed up to $1,000,000 for any and all financial losses sustained as a result of identity theft.

- 15 -

93.     Examples of such misrepresentations within LifeLock's advertisements include, without limitation, the following:

(a)     "With our million dollar guarantee, you have absolutely *nothing to lose* by signing up with us;"[18]

(b)     "LifeLock will pay you up to $1 million for damages stemming from the security breach. LifeLock says they will "make sure that you get every dollar back, lost wages, costs, actual losses, every dollar up to $1,000,000. Period.";[19] and

(c)     "*GUARANTEED!* -- If anyone steals your identity while you are a client, LifeLock will fix it. This is a $1,000,000 guarantee. LifeLock will do whatever it takes to restore your good name and will pay the cost of doing so. LifeLock guarantees that you get every dollar back: lost wages, costs, actual losses -- every dollar."[20]

94.     In fact, as of the date this Complaint was filed, LifeLock's website includes a video clip under the heading "View Our Latest TV Ad Campaign" which shows CEO Todd Davis, addressing a crowd with a megaphone, proclaiming:

"[i]f anything happens, for any reason, while you are a client of LifeLock, **we will cover all losses and all expenses up to one million dollars.**"[21]

95.     As with each of LifeLock's advertisements, the above message is deceptive and misleading as it contradicts the true nature and scope of LifeLock's "guarantee" by deceiving subscribers into believing they will be reimbursed up to $1,000,000 for financial losses incurred as a result of identity theft.

---

[18] *See* http://lifelockprotection.wordpress.com/2007/10/22/the-lifelock-guarantee/, as of July 7, 2008. (Emphasis added.)
[19] *See* http://www.lifelocklife.com/million-dollar-guarantee.html, as of July 7, 2008.
[20] *See* http://lifelock.promotional-code.org/, as of July 7, 2008.
[21] See http://www.lifelock.com/lifelock-for-people/who-we-are/view-our-latest-tv-campaign, as of July 7, 2008.

- 16 -

96.     Contrary to the representations made in LifeLock's misleading advertisements, the confusing and misleading Terms and Conditions of the actual guarantee reveal protections that are significantly limited in comparison to those advertised.

97.     In actuality, the narrow terms of LifeLock's service guarantee purport to disclaim all consequential damages and all liability for anything beyond a defect in their service.

98.     Accordingly, the service guarantee is only enforceable when LifeLock fails to properly place a fraud alert or properly request to remove the subscriber from a pre-approved credit card or junk mail list.

99.     This language is confusing and deceptive and intended to mislead an d deter members from asking LifeLock to cover losses or pay for consequential damages such as hiring professionals to restore their losses, and to provide LifeLock with a basis for denying any such claims.

100.     In addition, this language in inconspicuously embedded within LifeLock's "Terms & Conditions."

101.     This language is completely contradictory to the misleading impression that is created by LifeLock's advertisements – namely, that subscribers will receive reimbursement up to $1,000,000 for financial losses sustained as a result of identity theft.

102.     For example, assume LifeLock properly places a fraud alert on a subscriber's credit profile.  Now assume that a lender issues a credit card to an identity thief because that lender never called the subscriber.  In that case, LifeLock would avoid having to make good on its service guarantee since it properly administered its services.  This is deceptive.

103.     In further contrast to the misrepresentations in its advertisements, in the event that the Service Guarantee is triggered, LifeLock is not required to "spend up to $1,000,000.00 to make it right" or "cover all losses and all expenses up to one million dollars" under the Terms & Conditions."[22]

104.     Rather, LifeLock would only be required to:  (a) reimburse direct expenses the subscriber incurred up to $1,000,000; and (b) assist and advise damaged subscribers by paying

---

[22] *See* http://www.lifelock.com/lifelock-for-people.aspx, as of July 7, 2008.

1  third-party professionals up to $1,000,000 to resolve the subscribers' damages, including,

2  without limitation, damages to their credit profiles and credit ratings.

3      105.    Contrary to the net impression created by each of its advertisements, LifeLock

4  will not use the $1,000,000 to actually recoup or reimburse any of the subscribers' financial

5  losses.

## LIFELOCK MISREPRESENTS THE SECURITY OF
## SUBSCRIBERS' PERSONAL INFORMATION

9      106.    LifeLock misrepresents its ability to maintain the security of its subscribers'

10  personal and confidential information.

11     107.    LifeLock subscribers who enroll on-line are required to furnish LifeLock with

12  confidential sensitive personal information, including their social security numbers, which

13  they submit over the internet to complete their on-line application.

14     108.    LifeLock dedicates an entire page of its website to assuring subscribers that it

15  "follows **industry best practices** to secure and protect [their] personal information."[23]

16     109.    According to the LifeLock website, LifeLock is "ISO 27001 certified for data

17  and operational security," and conducts "background checks on **all of our** employees,

18  including regular random drug testing."[24]

19     110.    The LifeLock website further states that "All of our facilities are built with the

20  latest biometric security access as well as state-of-the-art surveillance and alarm systems,"

21  and that "No computers anywhere outside of secure data centers have our member's critical

22  information on them."[25]

23     111.    Each of these representations is false and misleading.

24     112.    Upon information and belief, LifeLock hires third-party contractors who work

25  remotely from their homes.

---

[23]  http://lifelock.com/lifelock-for-people/how-we-do-it/how-does-lifelock-secure-my-personal-information, as of July 7, 2008.
[24]  Id.
[25]  Id.

- 18 -

113. Upon information and belief, these third-party contractors possess, maintain, and/or have unfettered access to subscribers' social security numbers, credit card numbers, home addresses and dates of birth.

114. LifeLock does not conduct background checks on all of these third-party contractors.

115. LifeLock fails to implement any security measures or protocols to secure and protect subscribers' confidential and sensitive information once it has been accessed and is in the control or possession of these third-party contractors.

116. LifeLock's website is also vulnerable to compromise and as a result, LifeLock's subscription database is accessible by third-parties, including computer hackers.

117. As a result of the infirmity of the LifeLock website, the sensitive and confidential information provided by LifeLock subscribers, through the on-line enrollment application, can be accessed and misappropriated by third-parties, including computer hackers.

118. Upon information and belief, LifeLock has been advised of this lapse in security, and to date, has not resolved the problem.


## LIFELOCK USES DECEPTIVE AND MISLEADING DATA TO SUBSTANTIATE THE EFFICACY OF ITS SERVICES


119. According to the LifeLock website, "[l]ast year alone, 3 percent of all Americans, that's 8.4 million people, were victims of real identity theft."[26]

120. LifeLock's website further states that "[a]nalysts at LifeLock, which protects the identities of over a million members, statistically would have expected to see 10,000 of its members experience identity thefts in just the first four months of 2008."[27]

121. LifeLock's website deceptively claims that "only 105 LifeLock members in the history of the company, or just over .01 percent of those protected by LifeLock, have ever

---

[26] http://www.lifelock.com/todd-davis?promocode=ADCONION, as of July 7, 2008.
[27] Id.

- 19 -

reported their identities stolen – and LifeLock 's \$1 Million Total Service Guarantee completely covered every one of them."[28]

122. Upon information and belief, LifeLock's claim that its "\$1 Million Total Service Guarantee completely covered every one[29]" of those subscribers whose identity was stolen is **patently false**

123. This statistic appears in numerous LifeLock advertisements and LifeLock CEO Davis has boasted about this "statistical data" during countless appearances on television, radio, and streaming internet video.

124. This "statistical data" is just another misleading piece of information meant to induce potential subscribers to enroll in LifeLock.

125. Specifically, the reason that "only 105 LifeLock members in the history of the company…have ever reported their identities stolen" is because LifeLock's definition of identity theft is extremely narrow.

126. LifeLock intentionally defines identity theft to pertain to only credit-related instances of theft to allow for the perpetration of its' fraudulent and deceptive scheme.

127. In contrast to LifeLock's inadequate definition of identity theft, the Federal Trade Commission employs a much broader meaning.

128. The FTC defines identity theft as occurring when someone "uses your personally identifying information, like your name, Social Security number, or credit card number, without your permission, to commit fraud or other crimes."[30]

129. The FTC further provides examples of the frauds that are being committed with misappropriated identity information, which include: (i) "credit card fraud"; (ii) "phone and utilities fraud"; (iii) "bank/finance fraud"; (iv) "government documents fraud"; and (v) "medical information fraud."[31]

---

[28] Id.

[29] Id.

[30] http://www.ftc.gov/bcp/edu/microsites/idtheft/consumers/about-identity-theft.html#Whatisidentitytheft, as of July 7, 2008.

[31] Id.

- 20 -

1    130.    Since LifeLock's service can only protect against new-account, credit related
2    fraud, the statistics LifeLock uses in its advertisements and testimonials to "illustrate" the
3    efficacy of its services are misleading and deceptive.

**THE PLAINTIFF ROBERT DILLON**

5    131.    In or about April 2008, Plaintiff Dillon decided to subscribe to LifeLock after
6    viewing the company's television advertisements and hearing the company's radio
7    advertisements.

8    132.    Based on those advertisements, Dillon was lead to believe that LifeLock would
9    provide him with comprehensive protection against all forms of identity theft.

10   133.    Dillon's decision to subscribe to LifeLock was also heavily based on the
11   company's purported One Million Dollar ($1,000,000) service guarantee, which, he was led to
12   believe, would reimburse him for any financial damage sustained by a subscriber as a result of
13   identity theft.

14   134.    Upon information and belief, as a result of its fraudulent campaign, LifeLock has
15   generated nearly one million subscribers, each of whom pay approximately One Hundred and
16   Ten Dollars ($110.00) per year for its "services."

17   135.    Thus, by virtue of LifeLock's deceptive scheme, its subscribers have each
18   suffered an ascertainable loss in the form of the subscription fees they pay for services that: (a)
19   do not provide the level of identity protection advertised; (b) may actually impair their ability to
20   obtain credit or financing; and (c) provide a service guarantee that is, at best, illusory.

**CLASS ALLEGATIONS**

22   136.    This action is brought as a class action pursuant to Cal Code Civ. Proc. § 382,
23   on behalf of the named Plaintiff and all others similarly situated.

24   137.    The legal claims at issue in this matter are questions of common or general
25   interest, of many persons, and the parties are numerous, it is impracticable to bring them all
26   before the court.

27   138.    The class is tentatively defined as:
28       All residents of the state of California (including persons and business entities)

- 21 -

that subscribed to LifeLock during the longest period permitted by the applicable statutes of limitations. Excluded from the Class are the officers, directors and employees of Defendants and their respective legal representatives, heirs, successors and assigns.

139.   Upon information and belief, the class has more than 1,000 members (including present and past subscribers).

140.   All members of the class assert claims for violation of the law as more particularly set forth herein.

141.   All class members pray for money damages.

142.   All class members pray for temporary and permanent injunctive relief, as well as declaratory relief, because the parties opposing the class have acted on grounds generally applicable to the class, thereby making appropriate injunctive relief to the class as a whole.

143.   The proposed class meets the criteria set forth for the maintenance of a class action as described below.

144.   **Numerosity:**   Members of the class are so numerous that their individual joinder is impractical.  The precise identities, number and addresses of members of the class are unknown to Plaintiff, but may and should be known with proper and full discovery of Defendants, third-parties, and their respective records.

145.   **Existence of Common Questions of Fact:**  The common nucleus of operative facts to be determined for the class as a whole center upon the deceptive advertising and marketing campaign employed by LifeLock and its agents in California.  The questions of fact common to class members include, but are not limited to, the deceptive advertising and marketing campaign described herein.

146.   **Existence of Common Questions of Law:**   There is a well-defined commonality and community of interest in the questions of fact and law affecting the members of the class.  The common questions of fact and law include, among other things:

(a)   Whether and to what extent Defendants' practices, conduct, and

- 22 -

misrepresentations violate California state law;

(b) Whether Defendants' fraudulent and deceptive marketing and advertising campaign constitutes an unlawful, unfair or fraudulent business act or practice within the meaning of the California Unfair Competition Law, *Cal Bus & Prof Code § 17200, et seq.;*

(c) Whether Defendants disseminated or caused to be made or disseminated before the public in this state, in any newspaper or other publication, or any advertising device, or by public outcry or proclamation, or in any other manner or means whatever, including over the Internet, any statement, concerning those services, professional or otherwise, or concerning any circumstance or matter of fact connected with the proposed performance thereof, which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading, in violation of the False Advertising Act, *Cal Bus & Prof Code § 17500, et seq.;*

(d) Whether Defendants engaged in and unfair or deceptive acts or practices by representing that LifeLock's services have sponsorship, approval, characteristics, uses, benefits, or quantities which they do not have in violation of *Cal Civ Code § 1770*;

(e) Whether Defendants engaged in and unfair or deceptive acts or practices by advertising LifeLock's services with intent not to sell them as advertised in violation of *Cal Civ Code § 1770*;

(f) Whether Defendants engaged in and unfair or deceptive acts or practices by inserting unconscionable provisions LifeLock's Terms and Conditions, in violation of *Cal Civ Code § 1770*;

(g) Whether Defendants' intended for Plaintiffs to rely on their deceptive and misleading advertisements in making their determination to enroll with LifeLock;

- 23 -

(h) Whether Plaintiffs and the putative class sustained injuries in fact, or monetary losses as a result of Defendants' fraudulent and deceptive marketing and advertising campaign;

(i) Whether Defendants' affirmative statements and material omissions constitute an unfair or deceptive act or practice;

(j) Whether LifeLock's radio, television, internet and print advertisements contained fraudulent representations and omissions;

(k) Whether the arbitration provision in the LifeLock "Terms & Conditions" is unconscionable and unenforceable;

(l) Whether the class action prohibition provision in the LifeLock "Terms & Conditions" is unconscionable and unenforceable;

(m) Whether the exculpatory provision dealing with attorney's fees and costs contained in the LifeLock "Terms & Conditions" is unconscionable and unenforceable;

(n) Whether Plaintiff and the putative class are entitled to recover compensatory, exemplary, statutory, minimum, and/or punitive damages, based on Defendants' fraudulent and illegal conduct or practices;

(o) Whether Plaintiff and the putative class are entitled to restitution and/or disgorgement of any ill-gotten gains; and

(p) Whether Plaintiff and the putative class are entitled to an injunction, enjoining LifeLock from further engaging in the deceptive practices alleged herein.

147. **Typicality:** Plaintiff is a member of the class. Plaintiff's claims have a common origin and share common bases. His claims originate from the same illegal and fraudulent practices of Defendants, and Defendants act in the same way toward Plaintiff and the class members. If brought and prosecuted individually, the claims of each putative class

- 24 -

1   member would necessarily require proof of the same material and substantive facts, rely
2   upon the same remedial theories, and seek the same relief.

3       148.   **Adequacy of Representation:**  Plaintiff can and will fairly and adequately
4   represent and protect the interests of all members of the class.  He has no interests that
5   conflict with or are antagonistic to the interests of the class members, and intends to
6   prosecute this action vigorously.  Plaintiff has retained the undersigned counsel who are
7   competent and experienced in class action and complex commercial litigation.  As such,
8   Plaintiff's counsel will fairly and adequately protect the interests of the class.

9       149.   Plaintiff's counsel will fairly and adequately protect the interests of the class.

10      150.   **Superiority:**  A class action is superior to any other available method for the
11  fair and efficient adjudication of this controversy, because:  (a) common questions of law and
12  fact overwhelmingly predominate over any individual questions that may arise, such that
13  there will be efficiencies to the courts and the parties in litigating the common issues on a class
14  basis rather than on an individual basis; (b) the damages to some class members are larger than
15  to others, but all claims are sufficiently small that individual prosecution of the claim would

16  not be an economically viable alternative; (c) class treatment is desired for optimal
17  deterrence and compensation; (d) the economies of scale inherent in litigating similar claims
18  on a common basis will enable this case to be litigated on a cost-efficient basis as a class
19  action, especially when compared to repetitive individual actions; (e) no unusual difficulties
20  are likely to be encountered in the management of this class action as the proofs as to liability
21  are common to all class members; and (f) this action would be effectively impossible to bring
22  as individual actions leaving Plaintiff and others similarly situated with no viable remedy.

## FIRST COUNT

## VIOLATION OF UNFAIR COMPETITION LAW

### Cal Bus & Prof Code § 17200, et seq.

27      151.   Plaintiff realleges and incorporates herein the allegations contained in the
28  preceding paragraphs.

- 25 -

152.     The acts and practices alleged herein were and are likely to mislead the general public and are unfair business practices within the meaning of *Business and Professions Code §17200 et seq.*

153.     The acts and practices alleged herein were and are likely to mislead the general public and are unlawful business practices within the meaning of *Business and Professions Code §17200 et seq.*

154.     The acts and practices alleged herein were and are likely to mislead the general public and are fraudulent business practices within the meaning of *Business and Professions Code §17200 et seq.*

155.     *Business and Professions Code § 17200* imposes strict liability upon the Defendants for the deceptive, unlawful, unfair and fraudulent acts as alleged herein, which were intended to and in fact did mislead the general public, including Plaintiff, within this state.

156.     Defendants deceptive advertisements, marketing scheme and general conduct are practices within the meaning of the *Business and Professions Code § 17200.*

157.     Defendants violation of *Business and Professions Code § 17500* as alleged herein this complaint is a violation of the *Business and Professions Code § 17200.*

158.     Every single advertisement in the above reference advertising campaign included misrepresentations which were meant to create the net impression that: (i) all LifeLock subscribers were provided comprehensive protection from all forms of identity theft; and (ii) all LifeLock subscribers would be reimbursed, up to one-million dollars ($1,000,000) for any financial losses sustained as a result of identity theft.

159.     Defendants intended for the Plaintiffs and the putative class to rely on those universal misrepresentations and omissions contained within LifeLock's advertisements as a means to induce them to enroll with LifeLock, and the Plaintiffs and the putative class did in fact rely on said misrepresentations and omissions.

160.     Plaintiffs and the putative class have paid money to LifeLock, in the form of monthly or annual subscription fees.

- 26 -

161. The subscription fees paid by the Plaintiffs and the putative class constitute injuries in fact and money lost as a result of Defendants' deceptive conduct.

162. Based on Defendants violations of *Business and Professions Code § 17200*, Plaintiffs are entitled to disgorgement of all ill-gotten gains, including without limitation all fees collected by Defendants from the Plaintiff and the Class.

163. Based on Defendants violations of *Business and Professions Code § 17200*, Defendants are entitled to restitution.

164. Based on Defendants violations of *Business and Professions Code § 17200*, Defendants are entitled to injunctive relief to require Defendants to cease any and all deceptive advertisements and to take all necessary corrective measures with respect to the manner and substance of its advertisements.

**SECOND COUNT**

**VIOLATION OF THE FALSE ADVERTISING LAW**

**Cal Bus & Prof Code § 17500, et seq.**

165. Plaintiff realleges and incorporates herein the allegations contained in the preceding paragraphs.

166. Defendants purportedly sell and provide identity theft protection services to the public throughout the United States, including those residents of this state.

167. Defendants purportedly sell and provide a one-million dollar ($1,000,000) service guarantee in connection with those purported identity theft protection services.

168. In furtherance of the sale of the above referenced "services" and "guarantee," Defendants engaged in a misleading and deceptive advertising campaign which is deployed through print media, television, radio, and the internet, and which reaches and impacts the residents of this state, including the Plaintiff.

169. Through the above referenced advertising campaign, Defendants have disseminated or caused to be made or disseminated directly to Plaintiff and the general public in this state, statements concerning the performance of those "services" and the "guarantee"

- 27 -

thereof, which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading.

170. Every single advertisement in the above reference advertising campaign included misrepresentations which were meant to create the net impression that: (i) all LifeLock subscribers were provided comprehensive protection from all forms of identity theft; and (ii) all LifeLock subscribers would be reimbursed, up to one-million dollars ($1,000,000) for any financial losses sustained as a result of identity theft.

171. Defendants intended for the Plaintiffs and the putative class to rely on those universal misrepresentations and omissions contained within LifeLock's advertisements as a means to induce them to enroll with LifeLock, and the Plaintiffs and the putative class did in fact rely on said misrepresentations and omissions.

172. Plaintiffs and the putative class have paid money to LifeLock, in the form of monthly or annual subscription fees.

173. The subscription fees paid by the Plaintiffs and the putative class constitute injuries in fact and money lost as a result of Defendants' deceptive conduct.

## THIRD COUNT

## VIOLATION OF THE CONSUMERS LEGAL REMEDIES ACT

### Cal Civ Code § 1750, et seq.

174. Plaintiff realleges and incorporates herein the allegations contained in the preceding paragraphs.

175. Defendants purportedly sell and provide identity theft protection services to the public throughout the United States, including those residents of this state.

176. Defendants purportedly sell and provide a one-million dollar ($1,000,000) service guarantee in connection with those purported identity theft protection services.

177. In furtherance of the sale of the above referenced "services" and "guarantee," Defendants engaged in a misleading and deceptive advertising campaign which is deployed through print media, television, radio, and the internet, and which reaches and impacts the residents of this state, including the Plaintiff.

- 28 -

178. Through the above referenced advertising campaign, Defendants have disseminated or caused to be made or disseminated directly to Plaintiff and the general public in this state, statements concerning the performance of those "services" and the "guarantee" thereof, which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading.

179. Through the above referenced advertising campaign, Defendants engaged in unfair or deceptive acts or practices by representing that LifeLock's services have sponsorship, approval, characteristics, uses, benefits, or quantities which they do not have.

180. Through the above referenced advertising campaign, Defendants engaged in unfair or deceptive acts or practices by advertising LifeLock's services with intent not to sell them as advertised.

181. Through the above referenced advertising campaign, Defendants engaged in unfair or deceptive acts or practices by inserting unconscionable provisions LifeLock's Terms and Conditions.

182. In a letter dated May 30, 2008, thirty (30) days prior to the Amendment of this Complaint to include this cause of action for violations of *Cal Civ Code § 1750, et seq.*, Plaintiff Robert Dillon notified LifeLock's Member Services Department that LifeLock was employing and committing methods, acts, or practices declared unlawful by *§ 1770*.

183. In that letter, Plaintiff Dillon demanded that the LifeLock "revise the language used in its advertisements and the messages delivered through the television, radio and internet to reflect the true and actual nature of the services offered and LifeLock's limited 'guarantee.'"

184. Plaintiff Dillon's notice was in writing and was sent to LifeLock by certified mail, return receipt requested.

### FOURTH COUNT
### UNJUST ENRICHMENT

185. Plaintiff realleges and incorporates herein the allegations contained in the preceding paragraphs.

- 29 -

186. Defendants have, by virtue of payments made by Plaintiff and others like him throughout the State of California, received hundreds of thousands of dollars in payments and have not provided the services that were promised and/or advertised.

187. Defendants have, therefore, received a benefit from Plaintiff and others like him, the receipt of which constitutes unjust enrichment to Defendants.

188. The Plaintiff and others like him are entitled to an award of damages or restitution consisting of the amounts that they paid to LifeLock and all other Defendants known or unknown

## FIFTH COUNT

## DECLARATORY JUDGMENT

189. Plaintiff realleges and incorporates herein the allegations contained in the preceding paragraphs.

190. In addition to the extremely one-sided terms included in its form adhesive "Terms and Conditions," LifeLock has included procedural obstacles, which intend to discourage claims against it and/or attempt to shield it from any liability.

191. These aforementioned provisions are unenforceable.

192. The provisions include, *inter alia*:

(a) Paragraph "11" requiring that all claims or disputes against LifeLock be governed by the laws of the State of Arizona; and

(b) Paragraph "12" requiring that: (i) any disputes or controversies arising from the "Terms & Conditions," against LifeLock, be settled by confidential arbitration; (ii) the subscriber agree not to participate in any dispute against LifeLock as a class representative or as a member of a putative class; and (iii) the subscriber pay his or her attorney's fees and costs.

- 30 -

193.    The onerous provisions in the form adhesive franchise agreement are violative of California public policy and shall be declared void and unenforceable.

194.    Plaintiff is therefore entitled to a declaration from the Court that the LifeLock "Terms and Conditions," are void and unenforceable, or in the alternative, the Court shall strike those provisions that are unenforceable.

## INJUNCTIVE RELIEF

Plaintiff realleges and incorporates herein the allegations contained in the preceding paragraphs.

1.    As a result of the foregoing, and because money damages are inadequate to fully compensate Plaintiff and others similarly situated, or to prevent further instances of the future violations, preliminary and permanent injunctive relief is warranted as follows:

a. LifeLock shall cease advertising its services in California, unless and until all advertisements are revised to include language that is neither deceptive or misleading; and

b. LifeLock shall be permanently enjoined from implementing the marketing scheme described herein or incorporated by reference.

**WHEREFORE**, Plaintiff, individually and on behalf of all others similarly situated, respectively prays for the following relief:

a.    That the Court enter an Order certifying the proposed class herein and appointing Plaintiff and the undersigned counsel of record to represent the class;

b.    That the Court enter an Order rescinding the LifeLock subscription of Plaintiff and each and every member of the putative class based on Defendants' fraudulent inducement thereof or, alternatively, damages for said fraudulent conduct;

c.    That the Court issue a preliminary injunction enjoining Defendants and all others, known and unknown, from continuing to engage in unlawful conduct as set forth in this Complaint pending a determination of the merits;

- 31 -

d. That the Court issue a permanent injunction enjoining Defendants and all others, known and unknown, from continuing to engage in unlawful conduct as set forth in this Complaint;

e. That the Court enter a declaratory judgment, declaring those offensive and unlawful provisions contained within the "Terms & Conditions" entered into by Plaintiff and each and every member of the putative class void and unconscionable and, therefore, unenforceable;

f. That the Court enter a declaratory judgment declaring the acts of Defendants to be in violation of *Cal Bus & Prof Code § 17200, et seq.;*

g. That the Court enter a declaratory judgment declaring the acts of Defendants to be in violation of *Cal Bus & Prof Code § 17500, et seq.;*

h. That the Court enter a declaratory judgment declaring the acts of Defendants to be in violation of *Cal Civ Code § 1750, et seq.;*

i. That the Court enter a declaratory judgment declaring that the LifeLock "Terms and Conditions," are void and unenforceable, or in the alternative, the Court shall strike those provisions that are unenforceable

j. That Plaintiff, and each member of the putative class, be awarded damages for each violation of law alleged herein;

k. That Plaintiff, and each member of the putative class, be awarded punitive damages against Defendants, in an amount to be determined at trial, for the willful, wanton and/or reckless disregard for their legal rights;

l. That Plaintiff, and each member of the putative class, be awarded costs and a reasonable attorney's fee, and/or the general authority of this Court;

m. That Plaintiff, and each member of the putative class, be awarded any and all additional compensatory, incidental and consequential damages, in an amount to be determined at trial;

n. That Plaintiff, and each member of the putative class, be awarded prejudgment and post-judgment interest on any and all of the foregoing damages, and

- 32 -

o.     That Plaintiff, and each member of the putative class, be awarded such further and general relief – both legal and equitable – as this Court may deem appropriate.

## DEMAND FOR TRIAL BY JURY

Plaintiff demands a trial by Jury as to all issues.

Dated:  July 22, 2008                                   **FREEDMAN & TAITELMAN, LLP**


By: _____
Michael A. Taitelman, Esq.
Attorneys for Plaintiffs

- 33 -